IN RE ESTATE OF BLUMREICH, Deceased: CALDWELL, by his Guardian ad Litem, Frederic C. Eberlein, Appellant, v. KAQUATOSH, Personal Representative of the Estate of Herman Blumreich, Deceased, and others, Respondents. [Case No. 75–728.]

CALDWELL, by Frederic C. Eberlein, Guardian ad Litem, Appellant, v. ESTATE OF BLUMREICH, Deceased, Kaquatosh, Personal Representative, Respondent. [Case No. 76–068.]

*Nos. 75–728, 76–068. Submitted March 7, 1978.—*
*Decided June 30, 1978.*
(Also reported in 267 N.W.2d 870.)

548

For the appellant the cause was submitted on the brief of *Eberlein & Gansen* of Shawano.

For the respondent the cause was submitted on the brief of *Jack J. Schumacher* of Shawano.

For Rachel Powless and Josephine Powless the cause was submitted on the brief of *John C. Black,* Guardian *ad litem,* of Shawano.

Brief amicus curiae filed by *Dennis J. Verhaagh* and *Denissen, Kranzush, Mahoney & Ewald, S. C.,* of Green Bay.

Brief amicus curiae filed by *Wisconsin Judicare, Inc.,* of Wausau.

CONNOR T. HANSEN, J. The petitioner, by his guardian *ad litem,* petitioned the Shawano-Menominee county court, probate branch, EDWARD P. HERALD, County Judge of Oconto county, Presiding, for a support allowance from the estate of the decedent, Herman Blumreich, and for a determination that he is the sole surviving heir of the decedent. The petition was denied.

Thereafter, the petitioner commenced an action for declaratory relief in the county court of Shawano-Menominee county, RALPH J. STRANDBERG, County Judge of Langlade county, Presiding, seeking a determination that he is the son of the decedent, Herman Blumreich; that he is entitled to inherit from the decedent's estate in the same manner as a legitimate child; and that he is eligible to commence an action for the wrongful death of the decedent. The petitioner's complaint was dismissed on the ground that the petitioner had not alleged facts sufficient to meet the requirements of proof set forth in sec. 852.05(1), Stats., and that in the absence of such an allegation, a posthumous determination of paternity would not terminate the controversy or confer any rights of heirship.

The petitioner appeals from the order dismissing his complaint in the declaratory judgment action and from the order denying his petition in the estate proceedings,

and the appeals have been consolidated for decision by this court.

The pertinent facts, as they appear from offers of proof made in the estate proceeding, are alleged to be as follows:

Delores Caldwell, the mother of the petitioner, kept steady company with the decedent, Herman Blumreich, throughout 1972 and 1973. They spent many nights together and in June, 1973, were living together. At that time, Delores Caldwell became pregnant. The only man with whom she had intercourse during the period of conception was the decedent, Herman Blumreich.

The decedent told acquaintances that he was the father of the unborn child and that he and Delores planned to marry before the child was born. However, he made no written acknowledgment of paternity; he made no admission of paternity in open court; and there was no adjudication of paternity.

The decedent, Herman Blumreich, was killed in an automobile accident on January 9, 1974. The petitioner, Herman Caldwell, was born to Delores Caldwell on March 31, 1974.

Herman Blumreich left an estate with a value of approximately $17,000. He was survived by two sisters, a brother, and two nieces, and by the petitioner, Herman Caldwell, whose rights are the subject of these appeals.

On appeal, the petitioner argues that he should be permitted to establish paternity by means of an action for declaratory judgment, and that he is eligible for a support allowance under secs. 861.31 and 861.35, Stats. In addition, he argues that sec. 852.05 (1) denies equal protection and due process of law to an illegitimate child born after the death of his putative father.

Briefs in opposition to the petitioner's arguments have been filed by the personal representative of the decedent's estate, and by the decedent's two minor nieces, by their

guardian *ad litem*. Briefs amici curiae have been filed by Wisconsin Judicare, Inc., and by Denissen, Kranzush, Mahoney & Ewald, S.C., representing the decedent's insurer. These briefs challenge and defend the constitutionality of sec. 852.05(1), Stats., respectively.

The following issues are presented:

1. May an illegitimate child take by intestate succession from the estate of his putative father, and maintain an action for the wrongful death of the putative father, where paternity has not been established as provided in sec. 852.05(1), Stats., during the life of the putative father?

2. May an illegitimate child whose paternity has not been established as provided in sec. 852.05(1), Stats., during the life of his putative father, receive an allowance for support and education from the estate of the putative father?

3. Does sec. 852.05(1), Stats., deny posthumous illegitimate children equal protection or due process of law?

I.

Sec. 852.05(1), Stats.,[1] provides that an illegitimate child may take by intestate succession from his father's estate if paternity has been (1) adjudicated under secs.

---

[1] Sec. 852.05(1), Stats., provides:

*"852.05 Status of illegitimate person for purposes of intestate succession.* (1) An illegitimate child or his issue is entitled to take in the same manner as a legitimate child by intestate succession from and through (a) his mother, and (b) his father if the father has either been adjudicated to be such under ss. 52.21 to 52.45, or has admitted in open court that he is the father, or has acknowledged himself to be the father in writing signed by him."

A child may also be legitimated by the subsequent marriage of his parents. Secs. 245.25 and 852.05(3).

52.21 to 52.45, (2) admitted in open court by the father, or (3) acknowledged by the father in a signed writing. In *Krantz v. Harris,* 40 Wis.2d 709, 714, 162 N.W.2d 628 (1968), this court held that an illegitimate child must satisfy these requirements to maintain an action for the wrongful death of his putative father.[2]

Herman Blumreich did not acknowledge paternity of the petitioner in open court or in a signed writing, and there was no adjudication of paternity prior to Blumreich's death. It is the petitioner's position, however, that sec. 852.05 (1), Stats., should be construed to permit him to establish paternity by means of a posthumous action for a declaratory judgment, and that such a construction is necessary to afford him reasonable opportunity to establish that he is the son of the decedent. It might similarly be argued that secs. 52.21 to 52.45 could be construed to permit the posthumous commencement of a paternity action against the estate of the putative father.

However, these approaches are foreclosed by the plain language of the statutes and by the controlling decision of this court in *Krantz v. Harris, supra.* In *Krantz,* a posthumously-born illegitimate child sought to maintain an action for the wrongful death of his putative father. This court held that such an action could be maintained only if the child had been legitimated by marriage or if

---

[2] Sec. 895.04, Stats., provides in relevant part:

*"895.04. Plaintiff in wrongful death action.* (1) An action for wrongful death may be brought by the personal representative of the deceased person or by the person to whom the amount recovered belongs.

*"(2)* . . . the amount recovered shall belong and be paid to the spouse of the deceased; if no spouse survives, *to the deceased's lineal heirs* as determined by s. 852.01; . . ." (Emphasis added.)

In the case of an illegitimate child, the "lineal heirs" of a decedent are determined by the provisions of sec. 852.05, Stats., formerly sec. 237.06, Stats. 1967. *Krantz v. Harris, supra,* at 714.

paternity had been established as provided in sec. 237.06, Stats. 1967, the precursor of sec. 852.05, Stats. 1975.

The child in *Krantz* conceded that he could not satisfy the statutory requirements, and this court therefore held that he could not maintain an action for wrongful death. This holding is controlling with regard to the construction of the statutes in question here.

Any argument that sec. 852.05, Stats., contemplates the commencement of a ch. 52 paternity proceeding after the death of the putative father was rejected by implication in *Kranz, supra.* In *Krantz* it was assumed, for purposes of a demurrer, that the child was in fact the child of the decedent. Nevertheless, it was held that the child could not meet the statutory burden of proof for establishing heirship, clearly implying that no posthumous paternity proceeding was available.

This conclusion is consistent with the provisions of ch. 52, Stats. Paternity proceedings must be conducted in the manner prescribed by the legislature, *State ex rel. Lyons v. DeValk,* 47 Wis.2d 200, 177 N.W.2d 106 (1970). Chapter 52, Stats., in its entirety demonstrates that such a proceeding is to be maintained during the life of the putative father. Among other things, that chapter provides for the apprehension of the alleged father and for his release on bail and permits him to cross-examine the complainant. Secs. 52.24 to 52.27. Further, a paternity proceeding may not be maintained when the district attorney declines to prosecute. *State ex rel. Smith v. Chicks,* 70 Wis.2d 833, 235 N.W.2d 694, 239 N.W.2d 9 (1975). Clearly, the legislature did not contemplate that such a proceeding would be commenced posthumously by a putative illegitimate child.

This is in harmony with decisions in other states, which:

". . . are almost unanimous that a filiation or bastardy proceeding may not be instituted after the death of the putative father, so as to charge his estate with the duty to support the illegitimate." Annot., 58 A.L.R.3d 188, 191 (1974). *See, e.g.: Carpenter v. Sylvester,* 267 So.2d 370 (Fla. App. 1972); *Toms v. Lohrentz,* 37 Ill. App.2d 414, 185 N.E.2d 708 (1962).

It is also significant that sec. 895.01, Stats., concerning survival of actions generally, does not identify paternity actions as surviving the death of the father.

Nor is an action for declaratory relief appropriate. The petitioner relies upon *Slawek v. Stroh,* 62 Wis.2d 295, 215 N.W.2d 9 (1974). In that case, this court held that the putative father of an illegitimate child was entitled to maintain a declaratory judgment action seeking a determination that he was the child's father. This holding was premised on the absence of any other procedure by which the father could establish his rights and duties.

The petitioner maintains that it is effectively impossible for an after-born illegitimate child to satisfy the requirements of sec. 852.05(1), Stats., and that, as in *Slawek, supra,* a declaratory judgment action should be permitted. In the present case, however, the petitioner does not seek merely a legal forum for vindication of his rights, but rather a revision of the substantive statutory criteria by which those rights are determined.

In effect, the petitioner asks this court to engraft onto the plain language of sec. 852.05(1), Stats., a fourth method of establishing paternity. On its face, the statute provides three methods by which paternity may be shown, and it cannot be said as a matter of law that an after-born child will be unable to meet any of these statutory requirements, or that an alternative avenue is necessary to provide a forum for vindication of the child's rights.

In *Larson v. ILHR Department,* 76 Wis.2d 595, 252 N.W.2d 33 (1977), this court held that an illegitimate

posthumously-born child was not a dependent entitled to payment of death benefits under the Worker's Compensation Act on the death of the putative father. This court emphasized that worker's compensation is wholly statutory in nature, and that the classifications and requirements for eligibility created by the legislature are exclusive.

Similarly, the law of descent and distribution is of legislative origin and subject to the control of the legislature; *see: Estate of Topel,* 32 Wis.2d 223, 230, 145 N.W.2d 162 (1966), and a cause of action for wrongful death is purely statutory. *Krantz v. Harris, supra,* at 714. As in *Larson, supra,* therefore, the criteria prescribed by statute must be considered exclusive in the absence of any constitutional infirmity.

## II.

The petitioner next contends that regardless of his ability to inherit from the decedent's estate or to maintain an action for wrongful death, he is eligible to receive a support allowance from the estate under secs. 861.31 and 861.35, Stats. Sec. 861.31(1) authorizes the probate court to order an allowance "for the support of the surviving spouse and any minor children of the decedent during the administration of the estate"; sec. 861.35 allows the court to order an allowance "for the support and education of each minor child until he reaches a specified age, not to exceed 18. . . ."

The petitioner maintains that he is a minor child of the decedent eligible to receive an allowance under these provisions. As authority for this proposition, he cites *In Re Woodward's Estate,* 230 Cal. App.2d 113, 40 Cal. Rptr. 781 (1964). There, a California District Court of Appeal held that an illegitimate child came within the class of "minor children" of a decedent entitled to allow-

ances from the decedent's estate. Although the child was ineligible to inherit under the relevant statute, the California court held that the right to a family allowance is not equivalent to, or dependent upon, the right to inherit. Rather, the court held, it is an extension of the parent's obligation of support, and extends to an illegitimate minor child. Emphasizing that the family allowance is favored by the law and is to be liberally construed, the court concluded that the statutory term "minor children," a term capable of embracing both legitimate and illegitimate children, evinced an intention to include the latter.

We do not find this reasoning persuasive. There is nothing in secs. 861.31 and 861.35, Stats., to indicate that the category of "minor children" entitled to allowances from a decedent's estate is larger than the category of children entitled to inherit from the decedent. To recognize different methods of establishing paternity for different purposes, as the holding in *In Re Woodward's Estate, supra,* appears to do, would be to create an inexplicable anomaly. We do not believe the legislature intended to permit a support allowance to be granted on the basis of posthumous proof of informal verbal acknowledgment of paternity, when such proof is excluded for purposes of establishing heirship and maintaining a wrongful death action.

It is more reasonable to conclude that secs. 852.05 (1), 861.31 and 861.35, Stats., are to be read *in pari materia.* The references to "minor children" in secs. 861.31 and 861.35 leave undefined the manner in which an illegitimate applicant for an allowance may establish that he is, in fact, the child of a decedent. In the absence of any indication to the contrary, we conclude that the legislature intended that such applicants establish their pa-

ternity in the manner prescribed by sec. 852.05(1). Because the instant petitioner has not satisfied these statutory requirements, he is ineligible to receive an allowance under secs. 861.31 or 861.35.[3]

## III.

The petitioner contends that sec. 852.05(1), Stats., as it affects both heirship and wrongful death actions, denies posthumously-born illegitimates equal protection and due process of law as guaranteed by the fourteenth amendment to the United States Constitution and by art. I, sec. 1 of the Wisconsin Constitution.[4]

---

[3] The briefs of amicus curiae, Denissen, Kranzush, Mahoney & Ewald, S.C., and of the decedent's nieces, Rachel Powless and Josephine Powless, by their guardian *ad litem*, rely by analogy upon sec. 895.04(2), Stats., as construed by this court in *Krantz v. Harris, supra,* for the proposition that no allowance may be ordered where there is no surviving spouse of the decedent. This construction is unreasonable in that it would preclude an allowance for any child, legitimate or illegitimate, where both spouses are deceased. Moreover, it is contrary to the plain language of secs. 861.31(2) and 861.35, which expressly provide for allowances and allotments to minor children where no spouse survives the decedent.

[4] The record in the declaratory judgment action does not show that the attorney general was served with a copy of the proceeding. Such service is required by sec. 806.04(11), Stats., whenever the constitutionality of a statute is put in issue in a declaratory judgment action and is essential to the subject matter jurisdiction of the courts. *O'Connell v. Bd. of Ed. Jt. Dist. #10,* 82 Wis.2d 728, 733, 264 N.W.2d 561 (1978).

The substance of the declaratory judgment action, as is clear from the complaint itself and from the petitioner's arguments on this appeal, is a constitutional challenge to sec. 852.05(1), Stats. Although the complaint did not, in so many words, request a declaration that the statute is unconstitutional, that was the gravamen of the action, and the purpose of the statute must control over the pleading techniques of the parties. *O'Connell v. Bd. of Ed., Jt. Dist. #10, supra,* at 735.

In these circumstances, the attorney general was entitled to be served. In the absence of such service, this court is without juris-

In a series of cases beginning with *Levy v. Louisiana,* 391 U.S. 68 (1968), the United States Supreme Court has considered the constitutionality of statutory classifications based on illegitimacy. These decisions establish that statutes such as sec. 852.05(1), Stats., are not subject to the strict scrutiny applied where such suspect criteria as race or national origin are involved. Although the standard of review "is not a toothless one," classifications based on illegitimacy fall "in a realm of less than strictest scrutiny." *Mathews v. Lucas,* 427 U.S. 495, 510 (1976).

The most recent of the Supreme Court cases, and the most relevant to the present question, is *Trimble v. Gordon,* 430 U.S. 762 (1977). In *Trimble,* the Supreme Court overturned provisions of the Illinois Probate Act which precluded an illegitimate child from inheriting by intestate succession from his or her father unless the child has been both legitimated by the inter-marriage of the parents and acknowledged by the father. The appellant in *Trimble,* Deta Mona Trimble, was an illegitimate minor girl whose parents had not married and who therefore was unable to inherit from the estate of her deceased father, despite the fact that she had been adjudicated to be his daughter in a paternity proceeding conducted during his lifetime.

This statutory discrimination against illegitimates could not be justified by reference to the state's interest in protecting the sanctity of marriage and the integrity of the family unit, the Supreme Court held. The Court reiterated previous holdings that a state may not attempt to influence the actions of men and women by imposing sanctions on the children born of their illegitimate re-

---

diction to consider the constitutional arguments advanced in that action. It is only because the constitutional issues were also raised in the estate proceeding that we consider them here.

lationships. Such efforts are not only unjust, but also ineffectual, inasmuch as illegitimate children can affect neither their parents' conduct nor their own status. *Trimble v. Gordon, supra,* at 768–770.

The Supreme Court recognized, however, that statutory distinctions based on illegitimacy may have other, more substantial, justifications. The Court recognized the state's legitimate interest in establishing a method of property disposition, and said:

"The orderly disposition of property at death requires an appropriate legal framework, the structuring of which is a matter particularly within the competence of the individual States. In exercising this responsibility, a State necessarily must enact laws governing both the procedure and substance of intestate succession. Absent infringement of a constitutional right, the federal courts have no role here, and, even when constitutional violations are alleged, those courts should accord substantial deference to a State's statutory scheme of inheritance." *Trimble v. Gordon, supra,* at 771.

More specifically, the Court recognized that the difficulty of proving paternity and the related danger of spurious claims are particularly acute in the case of illegitimate children of intestate men. The court acknowledged that:

"The more serious problems of proving paternity might justify a more demanding standard for illegitimate children claiming under their fathers' estates than that required either for illegitimate children claiming under their mothers' estates or for legitimate children generally. . . ." *Trimble v. Gordon, supra,* at 770.

In addition, the Court was sensitive to the necessity of drawing arbitrary lines to facilitate the potentially difficult problems of proof lurking in inheritance proceedings. *Trimble v. Gordon, supra,* at 771.

The state thus has valid interests in preventing fraud, resolving problems of proof and regulating the disposition of property at death. While these interests will not excuse otherwise invidious discrimination, they will sustain an enactment which "does not broadly discriminate between legitimates and illegitimates without more, but is carefully tuned to alternative considerations . . ." *Mathews v. Lucas, supra,* at 513. To survive constitutional review, a statute must not unnecessarily exclude significant categories of illegitimates whose inheritance rights could be recognized without jeopardizing the orderly settlement of estates or the dependability of titles to property passing by intestacy. *Trimble v. Gordon, supra,* at 771. The Illinois statute under consideration in *Trimble, supra,* did not meet this standard because it unnecessarily and inexplicably excluded illegitimates such as Deta Mona Trimble, whose paternity had been established in a state court paternity action and whose claim would not in any way compromise the accurate and efficient disposition of the decedent's estate.

In striking down the Illinois statute, the Supreme Court made clear, however, that states may prescribe reasonable requirements regarding the proof of paternity. The Court said:

"Evidence of paternity may take a variety of forms, some creating more significant problems of inaccuracy and inefficiency than others. The States, of course, are free to recognize these differences in fashioning their requirements of proof. Our holding today goes only to those forms of proof which do not compromise the State's interests. This clearly would be the case, for example, where there is a prior adjudication or formal acknowledgment of paternity. Thus, we would have a different case if the state statute were carefully tailored to eliminate imprecise and unduly burdensome methods of establishing paternity." *Trimble v. Gordon, supra,* at 772, *fn.* 14.

Applying these principles to the instant case, we conclude that sec. 852.05(1), Stats., constitutes a "carefully tuned" statute sensitive to the conflicting considerations emphasized in *Trimble, supra*. There is no evidence that this statute reflects an impermissible effort to influence the conduct of parents by imposing sanctions on their illegitimate children. Indeed, the statutory provisions do not distinguish between legitimates and illegitimates so much as they distinguish among various categories of illegitimates, and they specifically allow proof of paternity by either of the two methods identified in *Trimble, supra,* as accurate and reliable: prior adjudication and formal acknowledgment.

We believe the exclusion of other forms of posthumous proof of paternity represents a reasonable effort ". . . to eliminate imprecise and unduly burdensome methods of establishing paternity." *Trimble v. Gordon, supra,* at 772, *fn.* 14. It has been said that the accusation of paternity is easy to make but difficult to defend against. *See, e.g.: In re Commissioner of Social Services,* 70 Misc.2d 581, 333 N.Y.S.2d 621, 623 (1972). To permit paternity to be established after the death of the putative father, on the basis of his alleged informal, verbal statements would be to place his estate at an unreasonable disadvantage in defending against spurious claims. The decedent would be unavailable to assert defenses or to assist in the cross-examination of his accusers. Information about his blood, which might conclusively eliminate him as the father, might not be available to his estate. His death thus undermines the reliability of the fact-finding process, and it is not unreasonable to require that a posthumous claim of paternity be supported by the types of documented evidence approved under sec. 852.05(1), Stats.

In addition, the statutory methods of proof avoid the extended uncertainty which would otherwise plague estate proceedings and wrongful death actions. It is apparently the petitioner's position that paternity may be established on the basis of undocumented evidence adduced at any time during the applicable period of limitations.[5] Such an approach would produce intolerable confusion. Potential heirs and claimants could not be identified with confidence until after the period of limitations had elapsed. The lurking possibility that an unknown putative child would come forward at some future time would frustrate the orderly settlement of estates and resolution of wrongful death claims. By requiring that paternity be evidenced in a recorded form during the father's life, sec. 852.05(1), Stats., reduces the likelihood that an unexpected claimant will appear years in the future. The statute thus serves the state's substantial interest in providing for the prompt and definitive determination of the valid ownership of property left by decedents, and such statutes are entitled to a degree of judicial deference. *Trimble v. Gordon, supra,* at 767, 768, *fn.* 12.

Proof of paternity by posthumous second-hand testimony would be imprecise, unreliable and susceptible to

---

[5] An action for wrongful death must generally be brought within three years after the wrongful act, neglect or default. Sec. 893.205(2), Stats. However, sec. 893.33(1) tolls statutes of limitations for persons under the legal disability of infancy and permits them to bring actions within one year after they reach the age of majority. Authorities are divided as to whether such a general savings provision is applicable to a statute of limitations for wrongful death actions, *see:* Annot., 132 A.L.R. 292, sec. III, pp. 317–320 (1941), and 22 Am. Jur.2d, *Death,* sec. 45, pp. 639, 640, and it is unnecessary to resolve that question here. At a minimum, the approach proposed by the petitioner would allow him to prove his undocumented paternity at any time within three years after the alleged wrongful act.

fraudulent claims, and would inject intolerable uncertainty into estate proceedings and wrongful death actions. Because such posthumous proof would compromise the valid interests of the state, it is not unreasonable to require that paternity be adjudicated, or acknowledged in open court or in writing by the putative father.

This conclusion is buttressed by the decision of the New York Court of Appeals in *Matter of Estate of Lalli*, 43 N.Y.2d 65, 400 N.Y.S.2d 761 (1977), *probable jurisdiction noted*, — U.S. —, 98 Sup. Ct. 1482, 55 L. Ed.2d 514 (1978), and by the decision of the United States Supreme Court in *Mathews v. Lucas, supra.*

In *Lalli, supra,* currently on appeal to the Supreme Court, the New York Court of Appeals considered the constitutionality of a New York inheritance statute which denied an illegitimate child the right to inherit from his or her intestate father's estate unless an adjudication of paternity had been made during the father's lifetime. The New York court concluded that this requirement, substantially more restrictive than those of sec. 852.05 (1), Stats., was consistent with the constitutional principles elaborated in *Trimble v. Gordon, supra.*

The New York court emphasized that the statute in question was not an expression of impermissible hostility to illegitimacy as such. Instead, the focus of the New York statute was on the form and manner, and thus the trustworthiness, of the proof of paternity; the statute was concerned "only with proof of paternity and the establishment of a blood relationship between the father and the child." *Matter of Estate of Lalli, supra,* at 763.

This observation is equally true of sec. 852.05(1), Stats. The methods of proof prescribed there do not represent a moral, social or ethical disparagement of illegitimacy, and are not intended to mold the conduct of the parents. They are intended only to serve the state's legitimate interest in the accurate and orderly settlement

of estates by requiring that paternity be established with a degree of formality and in a recorded form which will assure reliability and avoid extended uncertainty.

The New York statute considered in *Lalli, supra,* required that paternity be established during the life of the father. The New York court rejected the argument that such a requirement was constitutionally impermissible:

". . . Nor do we perceive the seeds of constitutional infirmity in the requirement that the judicial determination be made within the lifetime of the father. As we noted before, the father 'may be expected to have greater personal knowledge than anyone else, save possibly the mother, of the fact or likelihood that he was indeed the natural father. His availability should be a substantial factor contributing to the reliability of the fact-finding process.' . . . Indeed a formal acknowledgment of paternity, apparently found in *Trimble* to be an acceptable requirement, obviously entails personal participation by the father during his lifetime." *Matter of Estate of Lalli, supra,* at 763. (Citations omitted.)

Further support for the classifications set forth in sec. 852.05(1), Stats., can be found in *Mathews v. Lucas, supra.* In that case, the Supreme Court upheld statutory classifications concerning the right of illegitimate children to receive survival benefits under the Social Security Act upon the death of a wage-earning parent.

Under the statutory scheme in question, benefits were conditioned upon a showing that the child was dependent upon the parent at the time of death. Dependency was conclusively presumed for (a) legitimate children, (b) children ineligible to inherit under applicable state intestacy laws, (c) children whose parents' marriage was invalid as a result of some nonobvious defect, (d) children who had been acknowleged in writing, and (e) children whose paternity had been adjudicated during the life of the deceased parent. Illegitimates who did not come within these categories were required to bear the

additional burden of making individualized proof of dependency, and the appellee children in *Mathews v. Lucas, supra,* argued that this constituted unconstitutional discrimination.

The Supreme Court rejected this argument and concluded that the statutory classifications bore a "substantial relation to the likelihood of actual dependency" and reflected "reasonable empirical judgments that are consistent with a design to qualify entitlement to benefits upon a child's dependency at the time of the parents' death. . . ." *Matthews v. Lucas, supra,* at 510, 513. The Court stated:

"Congress' purpose in adopting the statutory presumptions of dependency was obviously to serve administrative convenience. While Congress was unwilling to assume that every child of a deceased insured was dependent at the time of death, by presuming dependency on the basis of relatively readily documented facts, such as legitimate birth, or existence of a support order or paternity decree, which could be relied upon to indicate the likelihood of continued actual dependency, Congress was able to avoid the burden and expense of specific case-by-case determination in the large number of cases where dependency is objectively probable. Such presumptions in aid of administrative functions, though they may approximate, rather than precisely mirror, the results that case-by-case adjudication would show, are permissible under the Fifth Amendment, so long as that lack of precise equivalence does not exceed the bounds of substantiality tolerated by the applicable level of scrutiny. . . ." *Mathews v. Lucas, supra,* at 509.

The requirements of sec. 852.05(1), Stats., constitute similar presumptions in aid of administrative functions; by requiring that paternity be shown from relatively readily documented facts, they safeguard the accuracy, integrity and finality of intestate succession. Like the statutory classifications upheld in *Matthews v. Lucas, supra,* sec. 852.05(1) marks a constitutionally permissible

"middle ground between the extremes of complete exclusion and case-by-case determination of paternity." *Trimble v. Gordon, supra,* at 771.

The instant petitioner further argues that sec. 852.05 (1), Stats., effectively "creates an insurmountable barrier" to inheritance or commencement of a wrongful death action by an illegitimate born after the death of the putative father. Amicus curiae Wisconsin Judicare joins in this argument, and consents that sec. 852.05(1) denies an after-born illegitimate due process of law because the child has no opportunity to establish his paternity. This "insurmountable barrier" argument is a formulation of the much-criticized "irrebuttable presumption doctrine."[6]

In *Trimble v. Gordon, supra,* the Supreme Court eschewed this approach. Despite the fact that such an analysis had been employed in several previous opinions, the court concluded that "focus on the presence or absence of an insurmountable barrier is somewhat of an analytical anomaly." *Trimble v. Gordon, supra,* at 773. The essential inquiry, instead, is a dual one, which gives due consideration to both the legitimate governmental interests promoted by a classification and the personal rights which may be endangered thereby. *Mathews v. Lucas, supra,* at 504.

We believe the classifications of sec. 852.05(1), Stats., are equally constitutional under either this approach or the questionable "insurmountable barrier" approach. In *Labine v. Vincent,* 401 U.S. 532 (1971), the Supreme Court rejected an "insurmountable barrier" challenge to Louisiana inheritance statutes. ". . . There is not the

---

[6] *See, e.g.:* Gunther, *Individual Rights in Constitutional Law* (2d ed. 1976), at 486–493; *Note, Irrebuttable Presumptions: An Illusory Analysis,* 27 Stan. L. Rev. 449 (1975); *Note, The Irrebuttable Doctrine in the Supreme Court,* 87 Harv. L. Rev. 1534 (1974).

slightest suggestion in this case that Louisiana has barred this illegitimate from inheriting from her father, . . ." the Court said, pointing out that a father could leave property to his illegitimate child in any of three ways: by executing a will, by marrying the child's mother, or by stating in his acknowledgment of paternity a desire to legitimate the child. *Labine v. Vincent, supra,* at 539.

Sec. 852.05(1), Stats., similarly prescribes alternative methods by which an illegitimate may establish a right to inherit from his father. There is no question that he may inherit if the father executes a will naming him a beneficiary. If the father dies intestate, the child may prove paternity by showing that his parents intermarried, that his father acknowledged paternity in open court or in a signed writing, or that an adjudication of paternity was made during the father's lifetime. These alternative methods of proof are more varied, and certainly no more onerous, than those approved in *Labine, supra,* and therefore cannot be said to deny the petitioner due process of law.

It follows from what we have said that the probate court was correct in denying the petition of the petitioner. The petitioner's complaint in the declaratory judgment action was properly dismissed because, in the absence of service upon the attorney general, the courts of this state are without jurisdiction to determine the controversy. Accordingly, the orders appealed from are affirmed.

*By the Court.*—Orders affirmed.

DAY, J. (*dissenting*). The majority holds that Herman Caldwell, an illegitimate child, has no right to inherit from his father, Herman Blumreich, or recover for his father's wrongful death.[1] If Herman Caldwell were a

---

[1] For the purpose of this appeal, the allegations in the declaratory judgment complaint must be assumed to be true. *Clark v.*

legitimate child he would at least be able to have a court hear his claims. Because he is a posthumous illegitimate, he is denied that opportunity. Sec. 852.05(1), Stats. (1975), which requires that result, denies Caldwell both equal protection and due process. For these reasons I would hold the statute unconstitutional as applied to posthumous illegitimates. I would also hold that Caldwell has a right to have his paternity established in a declaratory judgment action.

### Equal Protection.

The United States Supreme Court has not identified illegitimacy as suspect classification such as race or national origin, but it has struck down a number of classifications based on illegitimacy. In *Levy v. Louisiana*, 391 U.S. 68, 88 S. Ct. 1509, 20 L. Ed.2d 436 (1968) and *Glona v. Amer. Guarantee & Liability Ins. Co.*, 391 U.S. 73, 88 S. Ct. 1515, 20 L. Ed.2d 441 (1968), the court invalidated an interpretation of the Louisiana wrongful death statute that precluded a wrongful death action by one whose relationship to the decedent was illegitimate. In *Gomez v. Perez*, 409 U.S. 535, 93 S. Ct. 872, 35 L. Ed.2d 56 (1973), the court held that illegitimates were denied equal protection under Texas statutory and common law because, unlike legitimates, they had no right to support from their natural father. In the recent case of *Trimble v. Gordon*, 430 U.S. 762, 97 S. Ct. 1459, 52 L. Ed.2d 31 (1977), a section of the Illinois Probate Act was held unconstitutional on equal protection grounds. Under that section illegitimates could inherit by intestate succession only from

*Corby*, 75 Wis.2d 292, 301, 249 N.W.2d 567 (1977). The complaint alleges that Herman Blumreich was the father of Herman Caldwell. In the estate proceeding, Herman Caldwell's guardian ad litem offered to prove that Caldwell was the illegitimate son of Herman Blumreich.

their mothers. Legitimate children could inherit from either intestate mothers or fathers. *Trimble* at 430 U.S. 763.

However, a statutory classification may deny equal protection to illegitimate children even if they are not absolutely or broadly barred from a benefit. In *Weber v. Aetna Cas. & Surety Co.*, 406 U.S. 164, 92 S. Ct. 1400, 31 L. Ed.2d 768 (1968), the court held that it was a denial of equal protection to discriminate against unacknowledged illegitimates in providing benefits under a worker's compensation statute. The statute allowed unacknowledged illegitimates to recover benefits only if the statutory maximum recovery had not already been exhausted by benefits to legitimate children or acknowledged illegitimates. Under Louisiana law, an illegitimate child could be acknowledged by a declaration executed before a notary public in the presence of two witnesses, or at the registering of the birth or baptism of the child. *Weber* at 406 U.S. 167, fn. 3.[2]

---

[2] Under Louisiana law an acknowledgment could not be made if the parents were incapable of contracting marriage at the time of conception, but the acknowledgment could be made later if the parents contracted a legal marriage with each other. *Weber*, 406 U.S. 168, fn. 3. In Weber the deceased worker-father, Mr. Stokes could not easily have acknowledged his illegitimate children because he could not have contracted a legal marriage at the time of the conception of the illegitimates. At that time Stokes was married to another woman who was in a mental institution. Justice Blackmun, concurring in the result, thought that this added burden on Stokes was important and would have based his decision on that factor. However, Justice Blackmun acknowledged that the court was holding the Louisiana statute unconstitutional wholly apart from the inability of Stokes to acknowledge the illegitimates. 406 U.S. at 176, 177. The barrier to acknowledgment in *Weber* was not greater than in the case of a posthumous illegitimate under Wisconsin law because a putative father would have little reason to acknowledge an unborn child and paternity proceedings would not normally be initiated prior to birth.

In *Weber* the court struck down the statutory classification of unacknowledged illegitimates even though the bar to benefits was not absolute. This result was in accord with *Trimble* at 430 U.S. 774, where the court made it clear that the Illinois intestacy statute denied equal protection to illegitimates even though, under the statute, there was no insurmountable barrier to inheritance by illegitimates.

These U.S. Supreme Court cases demonstrate that while illegitimacy is not a suspect classification like race, classifications that discriminate because of illegitimacy will receive more far-reaching equal protection scrutiny than laws regulating social and economic matters. *Levy* at 391 U.S. 71, 72. *Trimble* at 430 U.S. 767.

". . .The tests to determine the validity of state statutes under the Equal Protection Clause have been variously expressed, but this Court requires, at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose. . . . Though the latitude given state economic and social regulation is necessarily broad, when state statutory classifications approach sensitive and fundamental personal rights, this Court exercises a stricter scrutiny. . . . The essential inquiry in all the foregoing cases is, however, inevitably a dual one: What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?" *Weber* at 406 U.S. 172, 173.

The test of "rational relationship to a legitimate state purpose" is the basic equal protection analysis. The further balancing test of ". . . What legitimate state interest [a] . . . classification promote[s]," versus ". . . What fundamental personal rights might the classification endanger?" involves further scrutiny. In statutory classifications involving illegitimates, this additional scrutiny is not a suspect classification analysis such as with race, but a middle level scrutiny requiring more than a rational relationship test.

In applying this middle level scrutiny and determining what state interest the classification promotes, the state's interest in encouraging stable family relationships may be considered. But, illegitimate relationships may not be discouraged by punishing the offspring of such relationships.

"The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent. Courts are powerless to prevent the social opprobrium suffered by these hapless children, but the Equal Protection Clauses does enable us to strike down discriminatory laws relating to status of birth where—as in this case—the classification is justified by no legitimate state interest, compelling or otherwise." *Weber* at 406 U.S. 175, 176.[3]

". . . we have expressly considered and rejected the argument that a state may attempt to influence the actions of men and women by imposing sanctions on the children born of their illegitimate relationships." *Trimble* at 430 U.S. 769.

However, the court has recognized that problems of proof in paternity actions do constitute a legitimate state interest,

---

[3] The Judiciary Committee's comment to Wis. Stats. Ann., sec. 852.05 (1977) is in agreement.

"Moreover, most illegitimate children become adopted, and their status becomes that of children of the adoptive parents. Nevertheless, it is important to modernize our statutes on inheritance by, from and through illegitimate persons. Although illegitimacy is still against public policy, a change in the inheritance laws does not promote illegitimacy but merely protects the innocent child."

"The more serious problems of proving paternity might justify a more demanding standard for illegitimate children claiming under their fathers' estates than that required either for illegitimate children claiming under their mothers' estates or for legitimate children generally." *Trimble* at 430 U.S. 770.

Such problems of proof are not an adequate rationale for all types of classifications or extra requirements concerning illegitimates,

"We recognize the lurking problems with respect to proof of paternity. Those problems are not to be lightly brushed aside, but neither can they be made into an impenetrable barrier that works to shield otherwise invidious discrimination." *Gomez* at 409 U.S. 538.

The purpose of sec. 852.05(1), Stats., as it applies to both heirship and wrongful death actions (sec. 895.04, Stats.) is to prevent fraudulent claims of paternity by alleged illegitimate children of deceased fathers. The statute attempts to limit such claims by requiring that an illegitimate prove heirship by an adjudication in a paternity action, an admission by the father in open court, or a written acknowledgment by the father. These requirements meet the first test: they are reasonably related to the purpose of preventing fraudulent claims. But, the statutory requirements do not attempt to balance the state's interest in preventing fraud against the posthumous illegitimate's "fundamental personal rights" of inheriting from his father and recovering for his father's wrongful death. The statute does not balance state against personal interest, but rather creates "an impenetrable barrier that works to shield otherwise invidious discrimination." *Gomez* at 409 U.S. 538.

An illegitimate child born prior to his father's death might have some chance to prove paternity and the collateral rights in dispute here. If the father were alive after the child was born it would be a good deal more

likely that a paternity proceeding would be initiated or that the father would have acknowledged the child in open court or in writing. While a paternity proceeding could be brought prior to the birth such an occurrence is extremely unlikely. It is equally unlikely that a putative father would acknowledge a fetus either in writing or in open court. Counsel for Herman Caldwell offered to prove that Delores Caldwell only had sexual relations with Herman Blumreich during the period of conception and that Blumreich had verbally acknowledged his responsibility for Delores Caldwell's pregnancy on several occasions. In the case of a posthumous illegitimate the further heavy burden of sec. 852.06(1), Stats. denies equal protection and bars any chance that the illegitimate might have of establishing his rights.

## Due Process.

Sec. 852.05(1), Stats., denies Herman Caldwell due process by creating an irrebuttable presumption that bars unacknowledged or non-adjudicated posthumous illegitimates from proving that they are heirs or entitled to wrongful death benefits.

The due process irrebuttable presumption analysis has been developed by the United States Supreme Court in a number of cases.[4] In *Stanley v. Illinois,* 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972), an Illinois statute allowed for a child to be declared a ward of the state if

[4] The court has made clear that the irrebuttable presumption analysis may not be applied to all statutory classifications. The right claimed affected by the irrebuttable presumption must have some constitutionally protected status. *Weinberger v. Salfi,* 422 U.S. 749, 771, 772, 95 S. Ct. 2457, 45 L. Ed.2d 522 (1975). However, from what has already been stated in the equal protection discussion, it is clear that the ability to establish paternity and inherit from one's father affects, ". . . sensitive and fundamental personal rights." *Weber* at 406 U.S. 172, 173.

it had no surviving parents. Parent was statutorily defined to include parents of legitimate children and the mother of illegitimate children. A child could not be declared a ward unless the parent was determined to be unfit. Mr. Stanley, the father of several illegitimates, whose mother had died, claimed that the statute unconstitutionally discriminated against him because it allowed for his children to become wards of the state with no adjudication of his unfitness.

The court based its ultimate holding on the equal protection clause, but also stated that the Illinois statute violated the fourteenth amendment due process clause. The court reasoned that while some fathers of illegitimate children might make unfit fathers, such fathers have parental rights, cognizable under the due process clause. Such fathers are denied due process by a presumption of their unfitness. *Stanley,* 405 U.S. at 657–659. The court held that while some illegitimate parents might make unsuitable parents, Mr. Stanley was entitled to a hearing to determine if he was fit. *Id.* at 405 U.S. 657, 658.

In *Vlandis v. Kline,* 412 U.S. 441, 93 S. Ct. 2230, 37 L. Ed.2d 63 (1973), the court declared unconstitutional a statute concerning classification of non-residents for purposes of tuition at a state university. Married students whose address was outside the state at the time of application, and unmarried students whose address was outside the state any time during the twelve months preceding application were classified as non-residents and were ineligible for lower tuition. The court analyzed the classification as an irrebuttable presumption and held that the state could not make a statutory classification purporting to be related to residency and then deny those seeking to meet the test of residency the opportunity to present factors concerning that issue. *Vlandis* at 412 U.S. 451, 452. The court stated,

". . . it is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a perma-

nent and irrebuttable presumption of non-residence, *when that presumption is not necessarily or universally true in fact,* and when the state has reasonable alternative means of making the crucial determination." 412 U.S. 452 (emphasis added).

In *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S. Ct. 791, 39 L. Ed.2d 52 (1974), the court considered administrative regulations that required teachers to take pregnancy leaves four or five months before birth was expected. The court determined that these regulations created an irrebuttable presumption of disability starting in the fifth or sixth month of pregnancy and, that based on medical evidence, this presumption was not clearly or universally true. The court held that absent an individual hearing the rules violated the due process clause of the fourteenth amendment. *LaFleur* at 414 U.S. 644–648.

These cases demonstrate that where a statutory or regulatory classification is not clearly or necessarily related to the purpose of the rule, a constitutional irrebuttable presumption is created and an individual litigant harmed by the classification has a due process right to a hearing to show that they do not fit within the purpose of the classification.[5]

This case represents a complete denial of due process for Herman Caldwell and similarly situated posthumous illegitimates. The purpose of sec. 852.05(1) is to avoid fraudulent claims against estates and fraudulent wrongful death claims. The statute has the effect of irrebuttably

[5] This analysis has been criticized by some commentators because while due process is the constitutional term employed, the analysis is similar to that employed in strict scrutiny equal protection. *The Irrebuttable Presumption Doctrine In The Supreme Court,* 87 Harv. L. Rev. 1534 (1974). Note, *Irrebuttable Presumptions: An Illusory Analysis,* 27 Stan. L. Rev. 449 (1974); Gunther, *Individual Rights In Constitutional Law,* p. 486 (1975). Despite these criticisms, *Stanley, Vlandis* and *LaFleur* still represent part of the governing minimal requirements of procedural due process.

presuming that all unacknowledged or non-adjudicated posthumous illegitimates, are making fraudulent claims and are not the children of the fathers they claim to be. This presumption ". . . is not necessarily or universally true in fact." *Vlandis* at 413 U.S. 452. As this case and the case of *Robinson v. Kolstad,* post, p. 579, 267 N.W.2d 886 (1978), forcefully demonstrate, the presumption is often incorrect.

The currently increasing number of illegitimate births poses a problem in estates and wrongful death actions. The percentage of illegitimate births nationally from 1960 to 1976 has almost tripled. In Wisconsin, the percentage of illegitimate births during the same period has more than quadrupled. Absolute numbers of illegitimate births during this period have more than doubled nationally, and almost tripled in Wisconsin.[6] Among the increasing number of illegitimate children there are bound to be those who, like Herman Caldwell, are born after the death of their father. Despite this phenomenon, sec. 852.-05(1), has the effect of denying posthumous illegitimates any means of establishing their paternity, unless a paternity proceeding is carried out or a written acknowledgment is made before the child is even born. These

---

[6]

| | WISCONSIN | | UNITED STATES | |
|---|---|---|---|---|
| YEAR. | ILLEGITI-MATE BIRTHS. | % OF TOTAL. | ILLEGITI-MATE BIRTHS. | % OF TOTAL. |
| 1976 | 7,143 | 11% | 468,100 | 14.8% |
| 1970 | 6,631 | 8.6% | 398,780 | 10.7% |
| 1965 | 3,906 | 4.7% | 291,200 | 7.7% |
| 1960 | 2,585 | 2.6% | 224,300 | 5.3% |

Source: Wisconsin Statistics are from the Public Health Statistical Reports, Tables 14 and 23. U. S. statistics for 1960–1970 are from Vital Statistics of U. S., Vol. 1 Natality, Table 1–29, p. 129 (1973). The 1976 figures are from the Monthly U. S. Vital Statistics Reports, Vol. 26, No. 12, p. 4 (March 29, 1978).

requirements effectively shut posthumous illegitimates out of the legal system and deny them the right to establish their paternity and attendant inheritance and wrongful death rights. Posthumous illegitimates, at least, must be given a chance to prove their paternity. The failure of the statute to provide that right is a denial of due process.

The majority claims that if sec. 852.05(1) were not in effect and if verbal evidence of paternity were admissible intolerable confusion would result.

"Potential heirs and claimants could not be identified with confidence until after the period of limitations had elapsed. The lurking possibility that an unknown putative child would come forward at some future time would frustrate the orderly settlement of estates and resolution of wrongful death claims." (p. 562)

This same lurking possibility of an unknown putative child is present under sec. 852.05(1). The father may have acknowledged an illegitimate child in writing, unknown to the other heirs or parties liable for the father's wrongful death.[7] With or without sec. 852.05(1), potential heirs and claimants can not be identified with confidence until after the period of limitations has elapsed.

Because sec. 852.05(1) is unconstitutional, I would also hold that Caldwell could bring a declaratory judgment to prove his paternity. Sec. 806.04, Stats. (1975), the Declaratory Judgment statute provides in pertinent part that,

"(1) *Scope.* Courts of record within their respective jurisdictions shall have power to declare rights, status,

---

[7] In *Estate of Ecker*, 174 Wis. 432, 182 N.W. 977 (1921), this court found that the requirement of a written acknowledgement of illegitimate paternity was met based on a contract and notes to a saloonkeeper. The contract for purchase of a thresher referred to "Joseph Ecker and son." One of the notes to the saloonkeeper was written in German and stated, "Give my son Adolph a keg of beer on my name. Joseph Ecker." *Ecker* at 174 Wis. 435.

and other legal relations whether or not further relief is or could be claimed. . . .

"(12) *Construction.* This section is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered."

In *Slawek v. Stroh,* 62 Wis.2d 295, 306, 307, 215 N.W. 2d 9 (1974), this court held that a declaratory action is an appropriate mechanism for a putative father to establish his natural parentage of an illegitimate child and to assert parental rights arising from that status.

In *Miller v. Currie,* 208 Wis. 199, 242 N.W. 570 (1932), this court held that the adult child of a common law marriage could have her alleged status, as the only legitimate child of her father, determined by a declaratory judgment.

I would also hold that a declaratory judgment is an appropriate means for an illegitimate child to establish rights of parentage. By the plain language of sec. 806.04 (1), the petitioner could have had any questions of his status and rights as a minor child of the decedent, not controlled by sec. 852.05 (1) adjudicated in a declaratory action. The trial judge in the declaratory judgment action in this case found that the criteria of sec. 852.05 (1) foreclosed heirship and wrongful death rights, absent compliance with the statutory requirements. If sec. 852.-05 (1) were constitutionally inoperative as applied to posthumous illegitimates there is no reason why that group could not use the declaratory action to establish their rights.

For these reasons I would reverse that part of the probate order that denied Herman Caldwell the right to a determination of whether or not he was an heir-at-law of the decedent, Herman Blumreich. Having determined in the probate court appeal that sec. 852.05 (1) violated

equal protection and due process, I would also reverse the order dismissing the declaratory judgment complaint.

I am authorized to state that Justice SHIRLEY S. ABRAHAMSON concurs in this dissent.